IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CHEVRON PIPE LINE COMPANY,<br>Plaintiff,[1]<br><br>vs.<br><br>PACIFICORP, d/b/a ROCKY MOUNTAIN POWER,<br>Defendant. | **ORDER AND MEMORANDUM DECISION RE: PENALTY PAYMENTS**<br><br>Case No. 2:12-CV-287-TC |

In 2010, crude oil from Plaintiff Chevron Pipe Line Company's (CPL) pipeline leaked into Red Butte Creek. Individual residents sued CPL and Defendant Rocky Mountain Power (RMP), and the companies filed claims against each other. A portion of CPL's claimed damages against RMP includes $3 million paid to the Utah Water Quality Board (UWQB) and Salt Lake City Corporation (City) to settle damage claims.

Now RMP asks the court to dismiss CPL's claim for $3 million. According to RMP, the $3 million is a civil penalty that may not be recovered from a third party under statute, common law, or public policy. The court agrees. Accordingly, RMP's motion for partial summary judgment concerning CPL's claim to recover the civil penalty payment is GRANTED.

[1]Chevron Pipe Line Company and Pacificorp d/b/a Rocky Mountain Power were originally co-defendants and counter/cross-claimants in this suit brought by a group of plaintiffs who have since settled the lawsuit. For the sake of simplicity, the court refers to CPL and RMP respectively as Plaintiff and Defendant.

**FACTS**

In June 2010, an electrical arc from RMP's electrical transition station created a hole in CPL's pipeline from which crude oil leaked into Red Butte Creek in Salt Lake City and flowed into Liberty Park Lake and the Jordan River. In December 2010, another release from the pipeline polluted the creek, but RMP had no connection to the December spill.

The UWQB issued two notices of violation (NOVs) to CPL alleging violations of the Utah Water Quality Act (UWQA). The first NOV addressed the June 2010 release, and the second NOV concerned the December 2010 release.[2]

On November 10, 2011, CPL entered into a global settlement agreement (Agreement) with the UWQB and the City to settle the NOVs and claims under City code. Among other things, the settlement required CPL to pay $3 million to fund "Mitigation Projects" "as a part of the penalty assessment pursuant to Utah Admin. Code R317-1-8.4." (Agreement ¶ 5.ii (emphasis added), attached as Ex. 3 to Motion, Docket No. 197-3.)[3] That $3 million was calculated based on consideration of penalty criteria set forth in Section R317-1-8.2 of the Utah Administrative Code (UAC). The Agreement did not allocate the $3 million between the two spills.

The Mitigation Projects were designed "to enhance and protect waterways that may have been affected by the Releases or otherwise relate to the Releases," (id. ¶ 5.ii), "by improving conditions for one or more of the following: wildlife, habitat, native vegetation, water quality or

[2]CPL contends that no oil was released into the creek after the December spill. But the UDWQ, in the NOV, identified contamination. "Water sampling in the creek and air monitoring around the area detected concentrations of benzene in the air and water attributed to the release." (Second NOV at 2, attached as Ex. 2 to Motion, Docket No. 197-2.)

[3]CPL also agreed to pay $500,000 to the State of Utah as a "civil penalty," (Agreement ¶ 5.i), but CPL does not seek recovery of the $500,000.

emergency response." (DWQ Proposal Request at 2, Ex. E attached to CPL's Opp'n, Docket No. 206-5.) The UDWQ, not CPL, selected the Mitigation Projects.

As part of that selection process, third parties submitted project proposals to the State, and the State selected seventeen for funding. As the selected applicants conducted the mitigation projects, CPL paid invoices out of the $3 million.

The Mitigation Projects enhanced the areas affected by the spills, and, in some cases, extended beyond those areas to places that were not in the path of the spills. The projects included, for example, educational outreach projects, installation of educational signs along the waterways, new water control structures, purchase of emergency equipment, construction of an improved boat dock and additional floating islands in Liberty Park Lake, removal of weeds to improve soil conditions for native plants, and construction of new filtration wetlands to address water stagnation issues. (See RMP's Reply at pp. xvi-xviii, 5-7, Docket No. 209.)[4]

CPL agreed "not to attempt to gain or generate any positive publicity, and further agree[d] not to deduct or otherwise attempt to obtain a tax benefit from the [Mitigation Project] funding or the Mitigation Projects and/or the total penalty amount." (Agreement ¶ 6.iii.) The Agreement also required CPL to pay "any unexpended mitigation funds to the State of Utah as a civil penalty in accordance with Paragraph 5.i [titled 'Civil Penalty Paid to the State']." (Id. ¶ 6.iv (emphasis added).)

Payment of the $3 million did not relieve CPL of other obligations. To make that clear,

[4]CPL unpersuasively contends that the nature of those projects is a fact question that may not be resolved on summary judgment. The record expressly identifies the projects and their purposes. There is nothing left to resolve.

the UWQB and the City carved out an exception to the settlement in the "Ongoing Obligations" section of the Agreement:

> Nothing in this Agreement shall constitute or be considered as a release from any obligation CPL has to submit information, conduct sampling and monitoring, implement work plans, or is otherwise required under the NOVs[.] . . . CPL shall continue to complete all clean up, remediation actions, and mitigation work for Red Butte Creek or any property that has been, or is in the future identified . . . as having been impacted by the Releases [at issue in the NOVs].

(Id. ¶ 8.iii.)

After CPL paid the $3 million and incurred other costs during clean-up and remediation, it filed a claim against RMP alleging negligence, trespass, private nuisance, and violation of the federal Oil Pollution Act (OPA). During discovery, CPL provided a list of its estimated damages to RMP, which included a line item for the $3 million paid under the Agreement. RMP now preemptively seeks dismissal of that portion of CPL's estimated damages.

**ANALYSIS**

RMP contends that under the plain language of the Settlement Agreement the $3 million is an unrecoverable civil penalty. CPL, on the other hand, characterizes the $3 million as a payment for natural resource damages, which would be eligible for contribution under OPA. Alternatively, CPL asserts that the question of whether the $3 million is a penalty is a genuinely disputed issue of material fact (i.e., whether the purpose and effect of the mitigation projects was to remediate natural resource damages caused by the spills) that cannot be resolved on summary judgment.[5] The court agrees with CPL.

---

[5]A court must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**The $3 Million is a Penalty.**

It is apparent from the Agreement's unambiguous language that the $3 million is a civil penalty, not a payment to repair natural resources. Section 5 of the Agreement required CPL to pay $3 million "as a part of the penalty assessment pursuant to Utah Admin. Code R317-1-8.4." (Agreement ¶ 5.ii (emphasis added).)

CPL tries to rewrite the Agreement by citing to non-contractual documents. It quotes portions of DWQ's responses to comments on the proposed settlement agreement as well as the City's explanation of the settlement that was posted on the City's website. (See, e.g., Opp'n at 9-11 (setting forth Facts 15-22), Docket No. 206.) According to CPL, those comments are evidence that the UDWQ intended the $3 million to fund remediation of natural resources. But RMP identifies statements in the very same documents that are consistent with the proposition that the $3 million is a penalty. (See Reply at 3, 8-10.) More importantly, those comments, which are not part of the settlement agreement, do not override the contract's plain language.

Language in the applicable administrative code sections further supports the conclusion that the $3 million is a penalty. When imposing a penalty under the UWQA, the UWQB considers the Utah Administrative Code's "Penalty Criteria for Civil Settlement Negotiations," which include the following principles: "[P]enalties should, at a minimum, recover the economic benefit of noncompliance [and] should be large enough to deter noncompliance . . . ." Utah Admin. Code R317-1-8.2 (emphasis added). That section also requires the UWQB to

> consider the magnitude of the violations, the degree of actual environmental harm or the potential for such harm created by the violation(s); response and/or investigative costs incurred by the State or others; any economic advantage the violator may have gained through noncompliance; recidivism of the violator; good faith efforts of the violator; ability of the violator to pay; and the possible

deterrent effect of a penalty to prevent future violations.

Id. (emphasis added).

In addition, when one looks at the mitigation project descriptions, it is apparent that they were not designed to remediate. The $3 million obligation that paid for those projects was designed to deter, an effect that is further reflected in limitations the Agreement placed on CPL. First, the projects had to be "in addition to all regulatory compliance obligations," with the cost "reflect[ing] a deterrent effect." UAC R317-1-8.4(A), (C). Second, CPL was not allowed to use the projects to "generate positive public perception for violations of the law." UAC R317-1-8.4(F). And third, regardless of whether the money went toward the projects or was paid into the State's fund, CPL had to pay the full amount: "[CPL must deposit] any unexpended mitigation funds to the State of Utah as a civil penalty in accordance with Paragraph 5.i [titled 'Civil Penalty Paid to the State']." (Agreement ¶ 6.iv (emphasis added).) In other words, if CPL did not pay for the Mitigation Projects, it still owed $3 million.

Finally, the Agreement expressly provided that CPL's obligations to clean up and remediate were not affected by the settlement. As noted above, the UDWQ, in the "Ongoing Obligations" section, preserved CPL's remediation obligations for, among other damages, natural resources.

For the foregoing reasons, the court holds that the $3 million was a penalty.

**CPL Has No Avenue of Recovery**

The $3 million settled the State of Utah's claims under the Utah Water Quality Act (and the City's claims under City code). The UWQA does not contain any provision allowing recovery of penalty payments from a third party. Moreover, CPL does not assert any cause of

action against RMP under the UWQA.

CPL's tort claims do not provide a basis for recovery. CPL's request for the $3 million is essentially a claim for contribution under tort law. But as this court held in an earlier order, the Utah Liability Reform Act abolished contribution actions. (See Nov. 29, 2016 Order & Mem. Decision at pp. 3–5, Docket No. 212.)

CPL unpersuasively argues that the $3 million is recoverable under OPA's contribution section, which provides that "[a] person may bring a civil action for contribution against any person who is liable or potentially liable under this Act or another law." 33 U.S.C. § 2709 (emphasis added). First, concerning recovery under "this Act," CPL did not pay the $3 million under OPA (neither the UWQB nor the City asserted OPA claims against CPL). Second, CPL may not rely on the "another law" language in Section 2709 because that phrase does not provide a separate right of recovery under OPA. Rather, it recognizes the statute's preservation of a party's right to recover additional expenses under a parallel state law. See Mid-Valley Pipeline Co. v. S.J. Louis Constr., Inc., 847 F. Supp. 2d 982, 991 (E.D. Ky. 2012) (noting that OPA's "savings clause," 33 U.S.C. § 2718(a)(2), preserves state laws that shift liability—i.e., does not pre-empt state laws for contribution—for costs and damages associated with oil spills). By preserving the right to recover, OPA simply recognizes that a person liable under OPA can also pursue a cost recovery claim under, for example, a state's tort law. Here, CPL alleges claims under Utah's tort causes of action for negligence, trespass, and private nuisance. But because Utah has passed the ULRA, contribution under Utah tort law is no longer available. OPA does not restore that right. In other words, where liability is imposed under state law, as it was here, CPL must look to state law, not OPA, to seek contribution.

Shifting the cost of a penalty to a third party would contravene public policy. Cases interpreting analogous environmental statutes note the need to preserve deterrence by barring recovery of a penalty. See, e.g., In re: Oil Spill by the Oil Rig, "Deepwater Horizon", 841 F. Supp. 2d 988, 1006 (E.D. La. 2012) (prohibiting a party from shifting liability for civil penalties under the Clean Water Act through contractual indemnification because doing so would violate public policy); United States v. B.P. Exploration & Prod., Inc., 753 F.3d 570, 575 (5th Cir. 2014) (recognizing that although the Clean Water Act allowed a party to shift liability to a third party for removal costs, there was "no such exception for civil-penalty liability."). Here, the $3 million was intended to have a deterrent effect. Shifting the cost to RMP would not be appropriate.

Finally, the penalty was tailored to CPL (its circumstances and its actions), and encompassed two spills, one of which RMP had no connection to. Trying to deconstruct the $3 million to determine what to allocate to RMP would be futile, for there is no principled basis for doing so.

**ORDER**

For the reasons set forth above, the court finds that CPL is not entitled to recover the $3 million from RMP in this case. RMP's Motion for Partial Summary Judgment on Chevron Pipe Line Company's Claim to Recover Civil Penalty Payments (Docket No. 197) is GRANTED.

SO ORDERED this 27th day of January, 2017.

BY THE COURT:

Tena Campbell

TENA CAMPBELL
U.S. District Court Judge